[Crim. No. 7263.   Second Dist., Div. One.   June 12, 1961.]

THE PEOPLE, Respondent, v. HARRY BERNARD ORINGER, Appellant.

Harry Bernard Oringer, in pro. per., for Appellant.

Stanley Mosk, Attorney General, and Elizabeth Miller, Deputy Attorney General, for Respondent.

WOOD, P. J.—Defendant was accused of grand theft in that he unlawfully took $600 which was the property of Joe Ann Hastings and Al Siegle Imports. In a nonjury trial he was convicted. He appeals from the judgment and sentence.

Appellant contends that the trial judge erred in denying his motion to set aside the information on the ground that he had been committed without probable cause. He also contends that the judge was biased and prejudiced against him, and he did not have a fair trial.

Defendant placed an advertisement in a newspaper wherein he offered employment to a girl chauffeur. On July 29, 1959, Mrs. Hastings answered the advertisement by telephone and then, pursuant to arrangements made by telephone, she went to defendant's alleged place of business in the Law Building in Los Angeles. Defendant told her that he wanted a chauffeur in connection with his bail bond business, that the salary would be $100 a week, and that the chauffeur was required to use her own car. He employed her. She owned a 1953 Jaguar car, but he told her that the car was too small for such work, since she would be transporting persons who were "on bail." She rented a larger car for $15 a week, and on Friday, August 7, 1959, she proceeded to perform her duties as chauffeur. Defendant told her that she was a good chauffeur and that she was hired permanently. Meanwhile she decided that she would buy another car.

On the following Monday, August 10, 1959, she drove her Jaguar car to "Al Siegle Imports" in South Gate and ascertained that Siegle would pay $600 for her car. The next day she told defendant that she had an offer of $600 for her car and she was going to sell it. He told her to "pick him up," and that he would have "another chauffeur" pick them up after she sold her car. Then she and defendant went, in her car, to Siegle's place of business and talked to Mr. Herman, the salesman with whom she had negotiated on Friday. She gave the "pink slip" (registered owner's certificate) to Herman, who checked the rear compartment of the car. He said that a spare tire and two curtains were missing. She said that she had left those things at her home. Then she and an employee of Siegle went, in the Jaguar car, to her home in Harbor City and obtained the tire and curtains. While they were away from the place of business (during a period of approximately forty-five minutes), defendant told Herman that he was a "bail bondsman" and that Mrs. Hastings owed money to defendant; that she owed the money because he had

"gone bail" for her on a drunk driving charge. Defendant asked Siegle to make the check for the Jaguar car payable to defendant. Defendant signed a bill of sale (for the car, as seller). (On the bill of sale, defendant wrote that his address was 351 South Witmer Street. That was not his address at that time—he had lived there previously. He testified that he wrote that address because it was the only address he could write—that there were only a few words which he could read or write.) Then, while Mrs. Hastings was absent, Siegle made the check for $600 payable to defendant and gave the check to defendant.

According to testimony of Siegle, he told Mrs. Hastings (after she returned from her home) that he had given the check to defendant who wanted the check in his name; and that she replied, "Okay."

According to testimony of Mrs. Hastings, she did not owe any money to defendant; she did not authorize defendant to receive the check or authorize Siegle or Herman to make the check payable to defendant; she did not make any statement to Siegle in response to information that defendant had the check.

When Mrs. Hastings returned to Siegle's place (from the trip to her home) another girl chauffeur of defendant, by the name of "Terry," who had come to Siegle's place, took defendant and Mrs. Hastings to a bank in Huntington Park. Defendant and Mrs. Hastings entered the bank, and defendant talked to a teller who said that it would take two days for the check to clear. Defendant retained the check, and they left the bank and entered Terry's car. Terry took them to a car "leasing" place in Hollywood "to see about leasing a car." When they arrived there about noon, the manager was not present. Defendant asked Mrs. Hastings to wait there. Then defendant went away and was gone about an hour and a half. During that time, the defendant returned to the bank in Huntington Park and endorsed and cashed the $600 check. The number of defendant's driving license was on the check. (The license had been issued about 10 years previously. He testified that he did not drive a car because he was nervous and he was not sure whether his driving license had been revoked about a year previously.)

When defendant returned to the "leasing" place in Hollywood (after having cashed the check at the bank), he made a telephone call, and then another girl chauffeur came there and took defendant and Mrs. Hastings to a Pontiac automo-

bile agency. Prior to going there, Mrs. Hastings had told a salesman at that place that she had sold her Jaguar car. While they were at that agency, she asked defendant about the check, and he said that he would go to his office and have a certified check "made out to" her. She had told him previously that she wanted the check cashed immediately so that she could buy a car. In the conversation with the salesman at that agency, regarding the down payment, defendant said that he had not had a chance to "get a certified check" and that he would get a certified check; that he knew that Mrs. Hastings had the money for the down payment, and that he would see to it that the money was brought to the agency. She signed a "car order" and a conditional sales contract for the purchase of a new Pontiac car. According to those documents, the down payment was to be $550. The salesman, after telling her to make the down payment within a few days, permitted her to take the car.

No part of the down payment was ever made, and the agency repossessed the car. The agency received no money from the sale but was required to pay the sales tax of $122.04 and to pay $28 for the license. In addition to that loss, the car had to be classified as a used car.

During the time from August 11 to and including August 14, 1959, Mrs. Hastings made many demands on defendant for the $600 check which was drawn by Siegle. Defendant replied to the effect that he was busy, and that he would go to his office and get a certified check. About a week after purchasing the Pontiac, when she demanded that he give the check to her, he told her to write a note to his secretary directing the secretary to make out a check for $100 for the Red Cross and a check for $600 for Mrs. Hastings. Mrs. Hastings asked defendant for the $600 check about twenty times before she referred the matter to the police. She did not receive the check. She did not authorize defendant to sign the bill of sale.

Prior to being employed by defendant, Mrs. Hastings lived in Harbor City which was several miles from defendant's alleged place of business. After obtaining such employment, she decided to move into an apartment at 3918 Beverly Boulevard in Los Angeles. She testified that defendant asked her to rent the apartment in his name; when she rented the apartment the defendant was present, and he told the landlord to "put" the apartment in the names of Mr. and Mrs. Oringer; she (Mrs. Hastings) paid the rent for the week commencing August 14; defendant was paying the rent for the use of the

telephone; he came to the apartment in the daytime and in the evening; she did not live with him; after staying there two weeks, she moved to another place because she had no money with which to pay the rent, and her salary was not being paid.

Officer Haley testified that he had a conversation with defendant on September 21, 1959, wherein defendant said: He signed the bill of sale and cashed the $600 check; Mrs. Hastings was with him when he cashed the check, and she identified him as the payee of the check so that the bank would cash it; the check was made payable to him because he was acting ''as power of attorney'' for her; immediately after cashing the check, he gave $550 of the proceeds to her and he kept $50 as a fee; by occupation he was a cook; he cannot read nor write.

Mrs. Hastings testified that she had not given defendant a power of attorney, and she was not present when the check was cashed.

In December 1959, while the charge herein was pending, the defendant, Mrs. Hastings, and Mrs. Herman who was a friend of defendant, met at a restaurant and had a conversation regarding the $600 check. Mrs. Hastings testified that, on said occasion, the defendant asked her if she ''would not testify'' if he signed a note for $600 which would be payable $50 a month; that Mrs. Herman wrote the note; defendant signed the note, and Mrs. Hastings said that she would not testify if he was sincere in wanting to pay her money to her; then defendant paid $25, and Mrs. Hastings gave a receipt for that amount; the note was not delivered to her.

While the charge herein was pending (and prior to said meeting at the restaurant), Mrs. Hastings commenced an action against defendant to recover the $600. The attorney who represented Mrs. Hastings in that action testified in substance as follows: Prior to December 24, 1959, defendant talked with the attorney many times by telephone, and he told her that he wanted to pay the money he owed to Mrs. Hastings; on December 24 the defendant came to the attorney's office and said that he had paid $100 to Mrs. Hastings on account of the amount sued for; the attorney told defendant that she (attorney) should not negotiate with him about the matter since defendant was represented by an attorney in the action; then defendant called his attorney by telephone; thereafter the attorney for Mrs. Hastings asked defendant to show the receipts which he claimed he had for the $100 assertedly paid

to Mrs. Hastings; defendant said that the receipts were in the car and he would get them; defendant also asked the attorney (witness) to make an affidavit to the effect that Mrs. Hastings owed the money to defendant; the attorney replied that she would not lie for him or anyone; then defendant said he would go to the car and get the receipts and would come back in a few minutes and show the receipts and pay the $500; defendant did not return to the office.

Mrs. Rotner, a witness called by the prosecution, testified in substance as follows: She had known defendant about four years and she had various transactions with him. She came to court on this day (second day of the trial) because she received a call from Officer Haley. About 9:30 a.m., while she was walking in the hallway toward the courtroom, the defendant came to her and said that if she testified against him he would have to go to jail; she replied that she was not interested in what he would have to do. Thereafter, while she was sitting on a bench in the hallway, the defendant walked toward her and said that he had the money that he owed her, about $2,000, in trust, and that if she would not testify against him he would give the money to her on Friday.

Defendant testified that he cannot read and write; he can read a "little bit"; when he and Mrs. Hastings started to go to Siegle's place, he received an oral power of attorney from her to negotiate the sale of her Jaguar car and to obtain the money from the sale; he did not tell Officer Haley that he had given $550, from the proceeds of the sale, to Mrs. Hastings or that he had received $50 for promoting the sale; he did not tell Officer Haley that Mrs. Hastings was with him when he cashed the check; he did not tell Herman, the salesman at Siegle's, that he had "gone bail" for Mrs. Hastings on a drunk driving charge; Mrs. Hastings told Herman that she had brought her boss with her and that he, the defendant, would take care of the business part of selling the car; before she left to get the spare tire, she told Herman "to pay the check" to defendant; the bill of sale was blank when he signed it; when Mrs. Hastings returned, after getting the tire, Siegle told her that everything was settled and that defendant had the check; she did not ask for the check; then defendant and Mrs. Hastings went to the bank, but he could not cash the check because he had no identification; then they went to the "leasing" place in Hollywood, where she remained while he went to his home and obtained his driver's license (as identification), and while he returned to the bank and cashed

the check; after he returned to Hollywood, they went to the Pontiac agency, where she told the salesman that defendant was her employer and that he was there to see that she got the right kind of deal; there was no conversation about a down payment; the salesman permitted her to take possession of a car, without completing the papers in connection with the transaction; at that time he (defendant) had "the $600 cash" in his pocket; later that day she told him he could use the money; he gave her $110 for use in paying her bills; later that day they had a discussion about living together; they moved into an apartment and lived there about two weeks; defendant paid the rent and other expenses; after the action to recover $600 was commenced he told her he was willing to pay what he owed her if she would tell the truth about things that had happened; she agreed to straighten the matter out with the police, and he signed a note for $600 and paid $25 to her; he kept the note in order to have a copy of it made, but the note has been lost; he did not ask the attorney for Mrs. Hastings to make an affidavit stating that Mrs. Hastings owed money to him; when he met Mrs. Rotner in the hallway, he did not ask her not to testify against him; he was shocked and upset to see her there because he thought she was called to testify about what happened while he was connected with the South Gate police station; she said she would like to have her money; he replied that he had put that money aside, and that probably he would give the money to her on Friday.

As above stated, appellant's first contention on appeal is that the trial judge erred in denying his motion to set aside the information. He asserts that the evidence was insufficient to show any probable cause for holding him to answer to the charge of grand theft. After referring to a statement of the deputy district attorney to the effect that the theory of the case "is grand theft by committing false pretenses," the appellant argues that the evidence "shows no false pretense." It would serve no useful purpose to discuss in detail the evidence presented upon the preliminary examination. That evidence clearly established probable cause for requiring that defendant be held to answer to the charge of grand theft. The court did not err in denying the motion to set aside the information.

As above stated, appellant's other contention is that the trial judge was biased and prejudicial against him, and he did not have a fair trial. He argues that bias and prejudice were indicated (1) by the refusal of the judge to grant a con-

tinuance of the trial so that appellant might discharge his attorney and employ another attorney; (2) by revoking "appellant's bail of $2,000," and remanding him to custody of the sheriff and increasing bail to $6,000; and (3) by refusing to set bail on appeal. The request by defendant for a continuance was made on the second day of the trial, as shown by the reporter's transcript beginning on page 175. Defendant was represented at the trial by an attorney whom he had employed. As above shown, Mrs. Rotner had come to the court as a witness, on the second day of the trial, and the defendant had talked with her in the hallway and, according to her testimony, he asked her not to testify against him. When the deputy district attorney announced that he was calling her as the next witness, the defendant addressed the judge and said that he would like to approach the bench with his counsel. The judge said that since defendant was represented by counsel, the defendant would not be permitted to address the court. Defendant's counsel told the defendant to talk to his counsel and then let counsel address the court. Thereupon, a recess was taken in order that defendant and his counsel might discuss the matter. After recess, counsel for defendant said that he and the defendant did not agree regarding the defense, but he was conscientiously trying to pursue his duty as an attorney and he was willing to proceed with the defense. He also said that it was his desire that defendant address the court. Then defendant said that he would like to hire new counsel to defend him. The judge said that the matter had been continued a long time and "we have proceeded at this time and so far as I can see your counsel has been most diligent in it and he has explored every possibility as far as this Court has seen, raising objections and going into matters which appear to be peripheral but in your favor and so forth and he is conducting the case with great earnestness as far as I can see." Defendant said that he was not satisfied with his counsel and that in justice he would like to have a chance to have new counsel. The judge said that justice also means the calling of witnesses back and forth, and he did not see any good grounds for granting a continuance, and that he would let present counsel stay in unless there was a legitimate reason for granting a continuance at that time. The judge also said the only situation in which a continuance could be granted at that time would be that the defendant stipulate that the depositions of the People's witnesses may be taken before the court at that time so that the witnesses will not be

called back on another trial. Thereupon, a recess was taken in order that defendant and his counsel might consider the matter. After recess, counsel for defendant said that defendant had agreed that, in the event the court granted a continuance, the testimony of the persons who have testified might be read into the record at the continued date. The judge said that it was not only the persons who have testified but it was also the witnesses who were then present and ready to testify; and that in the absence of some critical reason that the defense could not be conducted at that time, the continuance would be denied. Then the judge asked the deputy district attorney to call the next witness. Thereupon, Mrs. Rotner was called as a witness and she testified as hereinabove stated.

The above references to proceedings in connection with the proposed change of attorneys and the request for a continuance do not show the basis for defendant's alleged dissatisfaction with his counsel. Such basis is indicated, however, by defendant's testimony, which was given later in the trial, when he was referring to the incident of meeting Mrs. Rotner in the hallway. While he was testifying, in response to questions by his counsel, he said that when he saw Mrs. Rotner at the court he was upset, excited, and shocked. His counsel asked him the following question: "And she [Mrs. Rotner] unnerved you considerably, is that right?" Defendant answered: "Yes, she did, yes." Then his counsel said: "You stood up in court then, is that correct, when you saw her, you asked me to keep her off the stand, isn't that right?" He answered: "That wasn't the reason that I stood up in court." His counsel said: "I understand, but did you say, Harry, in an audible voice I want you to keep her off the stand at a close distance here?" He answered: "I believe I said that I didn't think that she should take the stand or I didn't want her to take the stand, yes, I could have said that, I am not sure." The above expression, "stood up in court," referred to the time defendant addressed the judge and asked permission to approach the bench. As hereinabove shown, he so addressed the judge when Mrs. Rotner was called as a witness. It thus appears that when she was called as a witness the defendant asked his counsel to keep her off the stand, and that when his counsel did not say or do anything with respect to keeping her from testifying, the defendant stood up in court, asked permission to approach the bench, and said he was dissatisfied with his counsel. Defendant's testimony indi-

cates that the basis for his alleged dissatisfaction was that his counsel did not keep Mrs. Rotner from testifying.

The refusal to grant a continuance so that appellant might change attorneys did not indicate any bias or prejudice on the part of the judge. Such ruling was not erroneous. The statements of the judge in connection therewith indicate a considerate and commendable attitude on the part of the judge.

During the trial the judge revoked an order which fixed the amount of bail in the amount of $2,000. (Defendant had furnished bail in that amount.) The order of revocation was made at the close of the morning session on the second day of trial, after Mrs. Rotner had testified that defendant told her that if she would not testify against him he would pay the $2,000 which he owed her. The judge said that in view of the testimony that there had been attempts to tamper with witnesses, he was revoking bail and ordering that defendant be remanded to the custody of the sheriff.

After the defendant had been adjudged guilty, the judge fixed bail in the amount of $6,000. (It appears that defendant furnished bail in that amount.)

The above-mentioned orders with respect to bail did not indicate bias or prejudice on the part of the judge. The matters as to revocation of bail and fixing the amount of bail were within the discretion of the judge. (Penal Code, §§ 1129 and 1175.) It does not appear that the judge abused his discretion in revoking or fixing bail.

The judge refused to admit defendant to bail pending appeal. That was a matter within the discretion of the judge (Penal Code, § 1272), and it does not appear that he abused his discretion. The refusal to admit defendant to bail does not indicate that the judge was biased or prejudiced against defendant during the trial or at all.

The defendant was accorded a fair trial.

The evidence was amply sufficient to support the judgment of conviction.

An affirmance of the judgment carries with it an affirmance of the sentence.

The judgment is affirmed.

Fourt, J., and Lillie, J., concurred.